OPINION
{¶ 1} This consolidated appeal arises from two judgments of the Allen County Common Pleas Court, sentencing Defendant-Appellant, Richard Bratton, upon his convictions for two counts of grand theft. Bratton's first conviction was for grand theft, without the consent of the owner or the person authorized to give consent, in violation of R.C. 2913.02(A)(1), for an approximate seventy-two hundred dollar overcharge. The second conviction was for grand theft, beyond the scope of the expressed or implied consent of the owner or person authorized to give consent, in violation of R.C. 2913.02(A)(2), for the approximate sixty thousand dollar non-payment of an advertising account with the Lima News. Bratton maintains that the court erred in denying his motions for acquittal and a new trial.
 Summary {¶ 2} The crux of the state's proof is based upon the comparison of invoices and billing statements between the Lima News, Bratton and Ahl, to circumstantially establish that Bratton committed theft in the form of over billing Ahl in the amount of five thousand dollars or more. Three factors converge to undermine the adequacy of this evidence and forge the result reached by this court: (1) whether Bratton was entitled to any commission as to the Lima News account was never adequately established in the record; (2) the impact upon the invoices arising from Ahl's decision in early 2000, to budget and advance advertising money to Bratton at the beginning of each month, was never adequately accounted for in the record; and (3) the status of Bratton's business relationship with Ahl and the Lima News, as either a fully independent advertising firm or as a mere "carrier" for Ahl, was not adequately established in the record — until approximately June 2001.
 {¶ 3} Specifically, the state's own testimony and documentary evidence in this case is inconsistent and inconclusive as to whether there was ever an agreement to allow Bratton a fifteen percent commission on the Lima News account. However, the fifteen percent commission alluded to in the testimony was to be credited in the billing from the Lima News to Bratton. In other words, it was understood that Bratton was free to negotiate a discount with the Lima News to charge him fifteen percent less for a given block of advertising than Ahl would have paid Bratton for the same block of advertising. This arrangement expressly contemplates that the monthly invoices from Bratton to Ahl would be commonly expected to exceed the invoices from the Lima News to Bratton by at least fifteen percent.
 {¶ 4} In addition, the testimony established that in early 2000 Ahl began estimating and advancing his Lima News advertising budget to Bratton at the beginning of the month, to be hopefully reconciled with actual advertising costs at the end of the month, (or at the beginning of the next month). As a result, everyone recognized that in the normal course of business, the actual costs for a given month might be less or greater than the estimated budget, and, in fact, this proved to be the case. Thus, this arrangement also contemplated that the invoices from Bratton to Ahl, would not necessarily be expected to match the amounts fronted to Bratton every month.
 {¶ 5} None of these factors are adequately accounted for in the evidence purporting to calculate the proper amount for any of the monthly invoices. As a result, discrepancies in the invoices alone — virtually the entire basis of the state's case — cannot support a conviction of theft in an amount equal to or exceeding five thousand dollars as alleged in the first count. Accordingly, we reverse the judgment and conviction of the trial court as to the first count.
 {¶ 6} The foregoing uncertainties as to monthly commission and budget, together with the inconclusive evidence as to the exact nature of the business relationship between Bratton and Ahl, also undermine the state's claim as to the amount of some sixty thousand dollars allegedly involved in the second count. However, as more fully discussed below, because the second count of theft is based upon different elements of proof and because the precise business relationship between Bratton and Ahl, including the scope of Ahl's consent over any funds entrusted to Bratton, was eventually clarified in the evidence pertaining to a single transaction in June 2001, it is our conclusion that the second count of theft in an amount equal to or exceeding $5,000 is established by the record. Accordingly, the judgment and conviction of the trial court as to the second count of theft is affirmed.
 Facts {¶ 7} Prior to February 2000, Tom Ahl, owner of several car dealerships located in Allen County, had a working relationship with Bratton, who ran Rick Bratton Enterprise. Bratton was also a well known television personality in the Lima area. During that period, Ahl and Bratton had a verbal agreement, whereby Bratton would arrange Ahl's television and radio advertising for the Ahl dealerships. Under that agreement, Bratton was compensated two hundred and fifty dollars a month, plus a fifteen percent commission on that advertising.
 {¶ 8} In 1992, Ahl signed a self-renewing advertising agreement with the Lima News, stating that he agreed to publish between 9,000 and 18,000 column inches of advertising. The agreement also stated:
For each 12 month period . . . should the advertiser fail to run theaforementioned volume of space, he agrees to pay short rate commensuratewith the appropriate rate bracket on The Lima News' current rate card.Likewise, should the advertiser exceed the amount of space contractedfor, The Lima News agrees to a rebate for the appropriate bracket on saidrate card.
The agreement also stated the price would be subject to a two percent discount if the account was paid in full by the fifteenth of each month following publication.
 {¶ 9} From that time until February 2000, employees of Ahl's dealerships personally handled the Lima News account; as well, they received and paid all bills from the Lima News. However, in February 2000, Ahl and Bratton agreed that Bratton would take over management of Ahl's account with the Lima News. Bratton then became responsible for determining the amount of space in the Lima News that the Ahl dealerships required. He would then arrange with the Lima News the necessary space at the best rates. The Lima News bills were sent to Bratton, and he would then bill Ahl monthly for all the Ahl dealerships' advertising, including the Lima News, other print media, television and radio.
 {¶ 10} In March 2002, Bratton was indicted by the Allen County grand jury for one count of grand theft, without the consent of the owner or person authorized to give consent, in violation of R.C. 2913.02(A)(1), for an overcharge in the amount of seven thousand, two hundred and eighty-nine dollars and eighty-six cents ($7,259.86), a felony of the fourth degree. In September 2002, Bratton was further indicted by the grand jury for one count of grand theft, beyond the scope of the express or implied consent of the owner or person authorized to give consent, in violation of R.C. 2913.02(A)(2), for non-payment of the Lima News advertising account in the amount of sixty thousand, seven hundred and forty-eight dollars and fifty-eight cents ($60,748.58). These separate indictments were consolidated for trial, and a trial was conducted before the court in January 2003.
 {¶ 11} At trial, the state presented the testimony of Tom Ahl, Louann Lawley, the Ahl dealership comptroller, Jim Shine, the general manager of the Lima News, Carmen Pinks, the Ahl dealership's Lima News sales representative, and Robert E. Sielschott, who had been jointly retained as a forensic accountant.
 {¶ 12} Both Ahl and Lawley testified to the verbal agreement between Bratton and the Ahl dealership, concerning the Lima News Account. According to Ahl, he and Bratton agreed that Ahl would pay Bratton upfront for each month, so that Ahl's account would be eligible for the monthly discounts. Ahl's checks were made out to Rick Bratton Enterprise. Rick Bratton Enterprise received a 1099 tax form at the end of the year from the Ahl dealerships, which required Bratton to claim these payments as income. There was conflicting testimony as to whether Bratton was to receive any compensation for his taking on the Lima News account.
 {¶ 13} Ahl also testified that he first became aware that the Lima News account was behind in March 2001. At that time, the Ahl dealership personnel became concerned with Bratton's handling of the Lima News account and a meeting was held. In June 2001, Ahl and the other dealership personnel had discovered that the Lima News account was in arrears by approximately fifty thousand dollars. At this point, a second meeting was held with Bratton. At this meeting, Ahl and the others confronted Bratton about the Lima News account. Ahl testified that Bratton told him he was having a cash flow problem and that Bratton had used money to purchase computers. Ahl and Lawley both testified that during that meeting, Bratton was specifically told he was to use the money he received thereafter from Ahl solely to pay the Lima News account. Finally, Lawley testified, that in July 2001, Bratton was given a check for twenty-one thousand dollars with the specific instruction to pay the Lima News account.
 {¶ 14} Robert E. Sielschott, CPA, also testified at trial. He testified about the Bratton/Ahl/Lima News transactions report (hereinafter referred to as the "transaction report") he prepared for trial. The transaction report was also admitted into evidence. Within the transaction report, Sielschott determined the variance between the amount Bratton was billing Ahl, the amount the Lima News was billing Bratton for the Ahl account, and the amount Bratton was paying the Lima News. In determining these figures Sielschott was provided with both the Lima News' invoices that were forwarded to Bratton for the Ahl account and the invoices prepared by the Bratton for all of Ahl's advertising. Sielschott was also provided with the checks Ahl wrote to Bratton and the checks Bratton wrote to the Lima News.
 {¶ 15} Following trial, the court found Bratton guilty of both counts of the indictment. Subsequently, the court merged the convictions for sentencing, pursuant to State v. Blankenship,[1] and sentenced Bratton to four years of community control, including thirty days confinement in the Allen County Jail, four hundred and eighty hours of community service, and restitution in the amount of seven thousand, two hundred and fifty-nine dollars and eighty-six cents ($7,259.86). It is from this sentence Bratton appeals, presenting this sole assignment of error for our review:
The trial court committed an error of law by denying the motions forAcquittal and a New Trial.
 {¶ 16} Bratton asserts that the state failed to prove that he had the purpose to deprive Ahl, as the owner of the funds, in both counts to the indictment.
 {¶ 17} Pursuant to Crim.R. 29(A) a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.[2]
 {¶ 18} The Bridgeman standard, however, "must be viewed in light of the sufficiency of evidence test[.]"[3] An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.[4]
 {¶ 19} In the first count, Bratton was charged with one count of grand theft, without the consent or person authorized to give consent, in violation of R.C. 2913.02(A)(1), for an overcharge of approximately seventy-two hundred dollars. R.C. 2913.02(A)(1) provides:
(A) No person, with purpose to deprive the owner of property orservices, shall knowingly obtain or exert control over either theproperty or services in any of the following ways:
 (1) Without the consent of the owner or person authorized to giveconsent;
 {¶ 20} Bratton argues that the evidence is insufficient to prove that he obtained or exerted control over the property without Ahl's consent. Based on the numerous irreconcilable inconsistencies found in the record, we agree. While the evidence clearly shows that this was a poorly conducted loose business arrangement, it fails to establish that Bratton overcharged Ahl with any criminal intent.
 {¶ 21} Bratton's argument, relying on State v. Burrows,[5] is that because he was freely given the money by Ahl he cannot be found guilty of a violation of R.C. 2913.02(A)(1).
 {¶ 22} In Burrows, the Eighth District Court of Appeals held that a bookkeeper, who was authorized by her employer to obtain or exert control over relevant cash transactions, could not be convicted of theft under R.C. 2913.02(A)(1). Burrows was a bookkeeper for an apartment management company and had responsibility to receive and process cash on a regular basis.[6] She would receive the cash from the property managers, note the amount in her ledger and mark the payment in the monthly deposit record listing.[7] Subsequently, she would pass the money along to the vice-president or office manager, along with a deposit slip indicating the amount.[8] At that point the vice-president or office manager was responsible for the actual deposit of money into the bank.[9]
Eventually, the vice-president noticed some discrepancies between the monthly record listing and the bookkeeper's ledger for approximately twelve thousand dollars.[10]
 {¶ 23} It was undisputed in that case that Burrows was authorized to obtain or exert control over relevant cash transactions.[11]
Accordingly, she could not be convicted under R.C. 2913.02(A)(1), but could arguably have violated R.C. 2913.02(A)(2).[12] Nevertheless, the court pointed out that that its discussion must be based on the crime for which Burrows' was indicted, tried and convicted.[13]
 {¶ 24} While Bratton correctly cites to the Burrows case, the state has never contested the fact that Ahl voluntarily gave Bratton the money in question. Rather the state argues that Bratton is guilty of the first count because the seventy-two hundred dollars was a "fictitious advertising charge" added to Ahl's bills. The state contends that Ahl only consented to the defendant's temporary handling of Ahl's money for the sole purpose of paying Ahl's existent Lima News advertising charges. Thus, any amount over and above the actual amount charged by the Lima News was considered a theft. While the state argues there is sufficient evidence in the record to support the above claim, we cannot say the evidence presented rises to that level.
 {¶ 25} First, there is the question of whether Bratton was entitled to a commission or any other compensation from Ahl for the additional work and responsibility of managing the Lima News account. According to Ahl, pursuant to the initial agreement between himself and Bratton, Bratton received a fifteen percent commission of the amount spent on the television and radio advertising. This agreement was entered into prior to Bratton taking on the Lima News account.
 {¶ 26} Ahl also testified that Bratton took on the Lima News account because the dealership wanted Bratton to keep everything within budget, including the Lima News. According to Ahl, when Bratton agreed to take on the Lima News account neither he nor anyone else agreed that Bratton could collect the fifteen percent commission for the Lima News Account. Lawley corroborated this testimony.
 {¶ 27} While there is testimony that Ahl and the Ahl dealership personnel did not think Bratton was entitled to any additional monies for taking on the Lima News account, that testimony does not unequivocally prove that Bratton was not entitled to, or at least believed that he was entitled, to a fifteen percent commission. Looking at the record in its entirety, we cannot find anywhere that Ahl or anyone from the Ahl dealership specifically denied that Bratton was entitled to the fifteen percent commission for the Lima News account.
 {¶ 28} Further, there was additional ambiguity surrounding the commission. Following the June meeting, where Bratton was confronted about the shortages and Bratton stated that he had used the money to buy computer equipment, Ahl told Bratton that Bratton was to use his "commissions" to make purchases for his business. Ahl also stated, that when things started falling apart he spoke to someone at the Lima News who indicated that they would prefer directly billing Ahl, so that Ahl could pay the Lima News direct. Ahl then stated the person from the Lima News "would pay Rick the commission off of that." Finally, Lawley testified, "that if [Bratton] needed to purchase anything he was — whatever commission he had coming to him he was to use for his purchasing or to go to the bank and to get a loan."
 {¶ 29} If Bratton was entitled to, or reasonably believed that he was entitled to a commission, then there is no evidence that there was in fact any overcharge. Based on the evidence that was presented, we cannot say that the state ever established that Bratton was not entitled to, nor could have reasonably believed that he was entitled to, some compensation for providing the work to Ahl. We further find it difficult to believe that any rational trier of fact could find that Bratton would take on such a substantial responsibility without the reasonable belief that he was entitled to some compensation.
 {¶ 30} The billing arrangement and the evidence presented by the forensic accountant only add another layer of confusion. At trial Sielschott, testified about the transaction report. In his report he determined both the variation between the amount the Lima News billed Bratton and the amount Bratton billed Ahl. He also looked at the payments Ahl was making to Bratton and the payments Bratton was making to the Lima News.
 {¶ 31} To determine the variation, Sielschott had to first determine the amount the Lima News billed Bratton for Ahl's account. Looking at the Lima News bills these amounts are straightforward and easily determinable. The Lima News bills broke down the Ahl account into three entities for billing purposes — Tom Ahl Chrysler, Tom Ahl Buick, and Tom Ahl Imports. To determine the Lima News invoice amount, these three figures were added together monthly.
 {¶ 32} Determining the amount that Bratton billed Ahl, however, was a much more tedious task. First, the Bratton bills to Ahl, included all of the advertising that Bratton was responsible for. Second, the Bratton bills to Ahl varied in form and were highly confusing in content. Third, the Bratton bills to Ahl were not only broken down into the three Ahl entities, but were further broken down into the "new" and "used" subcategories for each entity.
 {¶ 33} The early bills would essentially just give an amount owed for the Lima News for each of the Ahl billing entities. On some bills there were subsections with explanations. The bills then started to include a "budgeted" amount and an "actual" amount for the prior month, along with an overage or underage for each month. Although confusing, it appears that each month, Ahl would budget a certain amount for the subsequent month. The following month, that budgeted amount would be offset against what was actually billed by the Lima news and Bratton would either bill or credit Ahl for the difference between the budgeted amount and what was actually spent.
 {¶ 34} In comparing the Lima News bills that were forwarded to Bratton to the bills Bratton prepared for Ahl, there is no correlation whatsoever. Comparing the bills with Sielschott's transaction report, we are able to determine where his figures are derived from. However, when we consider the way that Ahl wanted Bratton to bill him, including the "budgeted" and "actual" amounts, and further consider the evidence relating to the possibility of a commission, we believe that the transaction report is not probative of any criminal activity by Bratton. Furthermore, when one looks at Sielschott's transaction report, it is apparent that the billings between the Lima News and Bratton never matched the billing between Bratton and Ahl. In some months, the discrepancy was in Bratton's favor, and in many other months, the discrepancy was in Ahl's favor.
 {¶ 35} Finally, we are also troubled by the final August bill of six thousand, two hundred and thirty-nine dollars and sixty cents ($6,239.60). In a footnote, Mr. Sielschott notes the following:
In August of '01, Mr. Bratton billed Mr. Ahl for additional Lima Newsitems of $8861.10, terms as `July overage'. This would be adjustments toprior months which adjust the budgeted amounts to actual. This would bethe norm. However, the Ahl bill for Lima News beginning in August of '01were sent directly to Ahl, so there was not August billing to Brattonfrom the Lima News, and no August billing from Bratton to Ahl for theLima News, and no August billing from Bratton to Ahl for August items.That explains the "0" in the first column.
While there is some confusion as to the discrepancy between the August amount shown on the chart and the amount noted in the footnote, it is more troubling that after reviewing the record we are unable to find an August bill from Bratton to Ahl. While there is testimony at trial, which discusses the $6,239.60, there is no bill, as there was for every other month. Furthermore, everything billed on the July bill appears to have been properly considered in the July figures. Accordingly, the $6,239.60 figure, which Sielschott includes in the amount that Bratton overcharged Ahl, is unsupported by the record.
 {¶ 36} Because of the monthly "budgeted" figures, and because the Lima News billing did not distinguish between the "new" and "used" advertising, it is impossible, based upon the evidence presented to the trial court, to determine what was being billed, what period it was being billed for, and whether the discrepancy was in Ahl's or Bratton's favor.
 {¶ 37} In other words, there is ample evidence that the business relationship between Ahl and Bratton was loose at best; however there is no evidence that it was criminal. It is further apparent that the issues in this case as to manner of the compensation, the potential over/under billing by Bratton, and the timing of the indictments relative to the course of the dealings between Ahl and Bratton suggest this is a civil matter, not criminal, and trial courts must be exceedingly careful in matters such as this, so as not to recreate debtor's prisons.
 {¶ 38} Based upon the above inconsistencies, we cannot find, even when considering all evidence in the light most favorable to the state, that a rational trier of fact could have found beyond a reasonable doubt that Bratton obtained or exerted control over the property without Ahl's consent, as to the seventy-two hundred dollar overage. Accordingly, we sustain Bratton's assignment of error as it relates to the charge in case number 1-03-18.
 {¶ 39} Turning to the second count, Bratton was charged with grand theft beyond the scope of expressed or implied consent of the owner, in violation of R.C. 2913.02(A)(2), for the sixty thousand, seven hundred and forty-eight dollars and fifty-eight cents ($60,748.58) non-payment to the Lima News. R.C. 2913.02(A)(2) provides:
(A) No person, with purpose to deprive the owner of property orservices, shall knowingly obtain or exert control over either theproperty or services in any of the following ways:
* * *
(1) Beyond the scope of the expressed or implied consent of the owneror person authorized to give consent;
* * *
 {¶ 40} Bratton asserts that a judgment for acquittal was proper because the evidence was insufficient at trial to prove that he purposely deprived Ahl of his property. Essentially, Bratton argues that because Ahl received all of advertising he paid for, Bratton's non-payment to the Lima News was a civil matter and Bratton cannot be guilty of theft under R.C. 2913.02(A)(2).
 {¶ 41} Bratton has consistently contended that he acted as an independent advertising agent, who provided the Ahl dealership with an advertising service. As an independent agent, Bratton maintains that the invoices he provided Ahl were more than just a conduit for Ahl's funds. Rather, Bratton argues those invoices represented services and goods that he had provided to Ahl and the monies he received were monies that the Bratton enterprise was free to control. To support his theory, there was testimony by both Ahl and Lawley that Bratton would receive a 1099 each year for the amount spent on advertising and that Ahl made the checks out solely to Bratton.
 {¶ 42} The state, on the other hand, maintains that Bratton was nothing more than a middle-man or delivery boy for the Ahl dealerships' money. According to the state, Bratton's tasks were limited in nature. Bratton was responsible for overseeing the Ahl dealership advertising accounts. According to Ahl and Lawley, Bratton was simply given a check and was to immediately transfer that money to the proper media outlets. For the state, Bratton was nothing more than a glorified cashier; consequently, any deviation for payment to the Lima News would have exceeded the scope of authority.
 {¶ 43} While both Bratton and the state provide some evidence to support their individual theories as to the nature of this relationship, neither are conclusive. Further, when considered in conjunction with the questionable compensation issue and the billing situation, it is impossible to reconcile the true expectations of this business arrangement. Accordingly, it is equally difficult to determine that Bratton exceeded the scope of their arrangement from February 2000 through the spring of 2001 — certainly not to any specific monetary amount.
 {¶ 44} Nevertheless, following the June 2001 meeting, when Ahl gave Bratton specific instructions as to the money he was providing Bratton, it is clear, at that point, what Bratton was to do with the money. It is equally clear that he exceeded the scope of that arrangement and went beyond the scope of what he was expressly required to do with the money.
 {¶ 45} At trial, Ahl testified that he gave Bratton a final check for twenty-one thousand dollars and instructed Bratton that he was specifically to take that money and pay the Lima News. Ahl stated, "I made it quite clear to him that * * * he was not to use that money for anything else." Lawley also testified that Bratton was told at the June meeting and prior to being given the twenty-one thousand dollar check for July, that he was "not to use that money for anything else."
 {¶ 46} When the issue in dispute is a defendant's purpose or intent, it is necessary to rely upon circumstantial evidence because intent cannot be proved by a third person's direct testimony but must be gathered from the surrounding facts and circumstances.[14] Such circumstantial evidence is as probative as direct evidence.[15]
 {¶ 47} Here, while the business arrangement that existed prior to the June 2001 meeting is muddled and confusing, the testimony of Ahl and Lawley show unequivocally that after that meeting Bratton was given specific instructions. At that point, regardless of who owed what to whom, the nature of the business relationship between Bratton and Ahl changed and for the first time became clear. When Bratton did not follow those instructions, he exceeded the scope of the express or implied consent of the owner, Ahl.
 {¶ 48} Relying on State v. Metheney,[16] Bratton argues that that late payment alone is insufficient to prove intent. Late or non-payment alone may be insufficient to prove intent; however, the evidence in this case goes beyond mere non-payment. As noted above, Bratton was given a twenty-one thousand dollar check with specific instructions to pay the Lima News account. Clearly Bratton's non-payment following that June 2001 meeting shows his intent.
 {¶ 49} Based upon the clear instruction Bratton was given at the June 2001 meeting, we find that a rational trier of fact could have found beyond a reasonable doubt that Bratton had gone beyond the scope of Ahl's consent, at least as to the twenty-one thousand dollar check. Accordingly, court did not err in denying Bratton's motion for acquittal as to the second count.
 {¶ 50} We turn now to Bratton's motion for a new trial, filed pursuant to Crim. R. 33. While Bratton lists no specific grounds for a new trial in his brief, we assume he relies upon Crim.R. 33 paragraph (4), which states, "the verdict is not sustained by sufficient evidence or is contrary to law. * * *"
 {¶ 51} The granting of a motion for a new trial made pursuant to Crim. R. 33 is directed to the trial court's sound discretion and will not be disturbed absent an abuse of discretion.[17] A court will not reverse a verdict as being against the weight of the evidence where there is substantial evidence upon which a finder of fact could reasonably conclude that all elements of an offense have been proven beyond a reasonable doubt.[18]
 {¶ 52} In light of our discussion in connection with appellant's Crim.R. 29 motion for acquittal, it is this Court's conclusion that the second count is sustained by sufficient evidence and is in accordance with law. Therefore, the trial court did not err in denying appellant's motion for a new trial as to the second count. Accordingly, we overrule Bratton's assignment of error as it related to the offense charged in case number 1-03-19.
 {¶ 53} Having found error prejudicial to appellant in the first count, we reverse the judgment in case number 1-03-18, and remand the matter for further proceedings consistent with this opinion. Having found no error prejudicial to appellant in the second count, we affirm the judgment of conviction in case number 1-03-19, and remand the matter for re-sentencing on this count.
Judgment of conviction affirmed in case No. 1-03-19, and cause remanded for re-sentencing.
Judgment reversed in case No. 1-03-18, and cause remanded.
Bryant and Shaw, JJ., concur.
[1] (1988), 38 Ohio St.3d 116,117.
[2] State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus.
[3] State v. Foster (Sept. 17, 1997), 3rd Dist. No. 13-97-09, unreported, citing State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in State v. Smith (1997), 80 Ohio St.3d 89.
[4] Jenks, 61 Ohio St.3d at paragraph two of the syllabus.
[5] (1992), 80 Ohio App.3d 404.
[6] Id. At 405.
[7] Id. at 405-406.
[8] Id. 406.
[9] Id.
[10] Id.
[11] Id. at 407.
[12] Id. at 408.
[13] Id.
[14] State v. Lott (1990), 51 Ohio St.3d 160, 168, certiorari denied498 U.S. 1017.
[15] Jenks, 61 Ohio St.3d at paragraph one of the syllabus.
[16] (1993), 87 Ohio App.3d 562.
[17] State v. Kiraly (1977), 56 Ohio App.2d 37, 53.
[18] State v. Eley (1978), 56 Ohio St.2d 169, syllabus, superseded by state constitutional amendment on other grounds in Smith,80 Ohio St.3d 89.