OPINION
{¶ 1} Defendant-Appellant, Margie Pifer, appeals a judgment of the Mercer County Court of Common Pleas, sentencing her upon her convictions for three counts of theft in violation of R.C.2913.02(A)(2) and (3). On appeal, Pifer asserts that the evidence is insufficient to support her convictions and that the convictions are against the manifest weight to the evidence. Finding that there is insufficient evidence to support Pifer's convictions under counts one and three, but that the evidence is sufficient to support her conviction in count two and that the conviction in count two is not against the manifest weight of the evidence, we reverse in part and affirm in part.
 {¶ 2} In the fall of 2002, Pifer began working part-time for Hazel Peak. Peak was in her nineties, and Pifer was hired to stay with and take care of Peak. During this period, Pifer was paid on an hourly basis and was only working weekends.
 {¶ 3} Around Thanksgiving of 2002, Pifer was approached by Peak and Peak's attorney, Donald Washburn, who was acting as Peak's power of attorney, about working as Peak's full-time caretaker. At that time, she was told she would be paid seven hundred and fifty dollars per week for her services, which included providing round the clock home health care for Peak seven days a week. While the record is not completely clear, it appears that Pifer began working as Peak's full-time caretaker at the end of November or the beginning of December 2002.
 {¶ 4} Having taken over as Peak's caretaker, Pifer began receiving phone calls from people to whom Peak owed money, stating that Peak had not paid them. Inquiring about the calls, Pifer discovered that Washburn had not been paying Pifer's bills. In January of 2003, Pifer reported Washburn to the Celina Police Department.
 {¶ 5} Detective Ronald Waltmire of the Celina Police Department took over the investigation into Peak's affairs. During his investigation into Washburn, he came across three checks to Showplace Rental ("Showplace"), a furniture rental and retail store in Celina, Ohio. Waltmire found that the three checks had been written in January of 2003, whereas no checks had been written to Showplace prior. In his investigation into the three Showplace checks, Waltmire found that while Peak did not have an account with Showplace, Pifer did. Additionally, when Waltmire spoke with Peak, she denied ever having done business with Showplace Rental, was not sure of what type of establishment it was and was surprised that her checks had ever been used there.
 {¶ 6} In November of 2003, based on Waltmire's investigation, Pifer was indicted by the Mercer County Grand Jury on three counts of theft in violation of R.C. 2913.02(A)(2) and (3), felonies of the fifth degree. Subsequently, Pifer executed a jury waiver and, a bench trial was held.
 {¶ 7} At trial, the State presented the testimony of Peak, Waltmire and Joseph Flohre, a Showplace manager. During Peak's testimony she stated that Pifer was her caretaker in December of 2002 through January of 2003. She also stated that she had authorized Pifer to write checks from Peak's account to pay for Peak's expenses after Washburn had been fired. Peak stated that when Pifer would write checks, she would sign them. However, Peak stated that she could not see well enough to read the checks; therefore, she did not know what the checks were for when she signed them. She testified that she would just sign the checks Pifer gave her to sign and she often did not know what the checks were for. Finally, Peak testified that she never authorized any checks to be written to Showplace Rental. When asked if she knew what Showplace Rental was, she stated that she did not know what it was, but thought that it was some type of gambling establishment.
 {¶ 8} Showplace Manager, Flohre, also testified on behalf of the State. Flohre testified that he never personally sold Pifer any merchandize from Showplace; thus, his testimony was solely used to verify Pifer's account information. According to Flohre, Pifer had an account with Showplace and the checks in question had been used to make payments on that account. Flohre testified that on January 16, 2003, Showplace received a check from Peak's account for three hundred dollars; on January 17, 2003, Showplace received a check from Peak's account for two hundred fifty dollars; and, finally, on January 24, 2003, Showplace received a check from Peak's account for four hundred fifty-one ollars and twenty-two cents. Each of these checks was applied to Pifer's account.
 {¶ 9} Finally, Detective Waltmire testified about his investigation into these checks.
 {¶ 10} Pifer presented the testimony of herself, Judy Shinn, Kent Taylor and David Slusser. Pifer testified that she was originally hired part-time and later moved to full-time. She also verified that she went from working hourly to being paid a flat weekly rate of seven hundred and fifty dollars per week. She testified that she contacted the Celina Police Department when she found out that Peak's bills were not being paid.
 {¶ 11} She went on to state that she had written the three checks in question. However, according to Pifer, she was authorized to write each of the checks. She stated that she had used the three hundred dollar and the four hundred fifty-one dollar checks to pay off her Showplace account. However, she stated that both those checks were part of her wages. As for the two hundred dollar check, she stated that check was used at Showplace to purchase a recliner for Peak.
 {¶ 12} During Peak's testimony she was questioned about Pifer's reasons for the three checks being written to Showplace. According to Peak, she was unsure of exactly what Pifer was being paid and she did not know anything about whether she had been paid in December of 2002. Additionally, when asked whether Pifer had purchased a chair for her from Showplace, Peak adamantly testified that Pifer had never purchased a chair for her.
 {¶ 13} Finally, Pifer testified about a garage sale incident which took place following Peak's being placed in a nursing home. The remaining witnesses' testimony all referred solely to that incident as well.[1]
 {¶ 14} Upon consideration of all the evidence, the trial court found Pifer guilty of all three counts of theft in violation of R.C. 2913.02(A)(2) and (3). Specifically, the trial court found that Peak at no time gave Pifer consent to write any of the checks to Showplace; that the checks written to Showplace were all written by the same person and were used to pay off goods purchased by Pifer; that the checks written to Showplace were in excess of the amount Peak agreed to pay Pifer for her caretaker wages; that Pifer acted knowingly and with the purpose to deprive Peak of the funds in question; that Pifer had acted with deception based on Peak's inability to see; and, finally, that evidence established that Peak was an elderly person. Thus, having found all elements were proven beyond a reasonable doubt, the trial court found Pifer guilty of each offense.
 {¶ 15} Subsequently, Pifer was sentenced upon her convictions. It is from this judgment Pifer appeals, presenting the sole assignment of error for our review.
It was an error of law for the trial court to find appellantguilty.
 {¶ 16} In her sole assignment of error, Pifer asserts that her convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Because "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different," we will address each separately. State v. Thompkins (1997),78 Ohio St.3d 380, para. two of the syllabus.
 {¶ 17} We first address Pifer's claim that the evidence was insufficient to support the finding that she was guilty beyond a reasonable doubt. An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, para. two of the syllabus, superseded by state constitutional amendment on other grounds in State v. Smith (1997), 80 Ohio St.3d 89.
 {¶ 18} In the case sub judice, Pifer was charged with three counts of theft beyond the scope of authority and or by deception in violation of R.C. 2913.02(A)(2) and (3). Specifically, the first count involved the three hundred dollar check; the second count involved the two hundred and fifty dollar check; and, the third count involved the four hundred and fifty-one dollar check. As noted above, Pifer claimed that the three hundred dollar check and the four hundred and fifty-one dollar check, in counts one and three respectively, were wages. The two hundred and fifty-dollar check she claimed was used to purchase a chair for Peak.
 {¶ 19} R.C. 2913.02(A)(2) and (3) provide:
(A) No person, with purpose to deprive the owner of propertyor services, shall knowingly obtain or exert control over eitherthe property or services in any of the following ways:
* * *
(2) Beyond the scope of the express or implied consent of theowner or person authorized to give consent;
 (3) By deception;
 {¶ 20} Pifer argues that the evidence is insufficient to prove that she had the specific intent to misappropriate funds. Specifically, she claims she was expressly authorized to use the funds in the manner they were used. As to the first and third counts, Pifer argues that she was entitled to those checks as payment for wages. We will address counts one and three together.
 {¶ 21} On appeal, Pifer argues that there was evidence presented at trial that she began working full-time for Peak around the end of November or beginning of December 2002. Pifer points out that this evidence was undisputed by the State. Additionally, the State put on evidence that Pifer was only paid a total of five hundred dollars in 2002. Thus, as Pifer argued at trial, the additional funds that she received in January of 2003 were compensation for wages she earned in December of 2002, but were not paid in 2002.
 {¶ 22} Upon a close review of the record, we find there to be a clear discrepancy as to whether Pifer was entitled to the funds in counts one and three as wages. Accordingly, pursuant to Statev. Bratton, 3d Dist. Nos. 1-03-18, 1-03-19, 2004-Ohio-187, if Pifer was entitled to, or reasonably believed that she was entitled to the funds in counts one and three as wages, then, in light of the record before us, we find there the evidence is insufficient to support a conviction for theft.
 {¶ 23} Bratton involved a situation where the defendant was charged with one count of grand theft without the consent of the owner or person authorized to give consent for a seventy-two hundred dollar overcharge on an advertising account, in violation of R.C. 2913.02(A)(1). Id. at ¶ 19. In Bratton, this Court reversed the trial court's finding of guilt, noting there were many discrepancies at trial over whether the defendant was entitled to a commission. Id. at ¶ 24-31. Based on the numerous inconsistencies as to that issue in the record, we stated the following:
If Bratton was entitled to, or reasonably believed that he wasentitled to a commission, then there is no evidence that therewas in fact any overcharge. Based on the evidence that waspresented, we cannot say that the state ever established thatBratton was not entitled to, nor could have reasonably believedthat he was entitled to, some compensation for providing the workto Ahl. We further find it difficult to believe that any rationaltrier of fact could find that Bratton would take on such asubstantial responsibility without the reasonable belief that hewas entitled to some compensation.
Id. at ¶ 29.
 {¶ 24} Following the rational set forth in Bratton, we are persuaded that the evidence presented at trial falls short in this case. While the State did present evidence that Peak did not have any knowledge of Showplace and denied authorizing the use of any checks there, we cannot say that evidence rises to the level necessary to sustain the State's burden. First, Peak's testimony is tenuous at best regarding the issue of Pifer's wages. She testified that her date of birth was January 15, 1905; however, when asked her age, she stated she was ninety, as opposed to ninety-nine. Peak had no knowledge of the exact arrangements or wages that Pifer was to be paid, for either Pifer's hourly wages or Pifer's salary wages. Additionally, Peak was not able to tell the court exactly when Pifer started working full-time. However, from Peak's testimony it seems clear that Pifer was working full-time in December of 2002. Essentially, upon review of the record, we find Peak's testimony to be inconclusive as to whether she would have had any knowledge or whether that knowledge was reliable regarding whether Pifer was entitled to the moneys used in the checks under counts one and three for wages.
 {¶ 25} Second, the testimony of Detective Waltmire and Flohre was also inconclusive as to this issue. At trial, Waltmire merely testified to how be came across the checks at issue, how he linked the checks to Pifer and that, when he talked to Peak, she had no knowledge of any checks being written to Showplace. Flore's testimony only provided evidence that Pifer used the checks at Showplace, which Pifer admitted herself.
 {¶ 26} Finally, Pifer presented evidence that she had been working full-time since at least the beginning of December of 2002, and the State presented evidence that she had only been paid a total of five hundred dollars in 2002. While the State did present evidence that Pifer had received over six thousand dollars in payments in January and February of 2003, that amount gains legitimacy in light of the testimony that she was not paid for her services in December of 2002.
 {¶ 27} Like Bratton, there is a serious question here as to whether Pifer was entitled to, or reasonably believed that she was entitled to the funds in question. Based on the evidence presented, we cannot say that the State ever established that Pifer was not entitled to those funds. Further, we are persuaded that Pifer was entitled to the funds in light of her service without compensation in December of 2002.
 {¶ 28} Accordingly, based on the evidence presented, as well as our decision in Bratton, we cannot find, even when considering the evidence in a light most favorable to the State, that a rational trier of fact could have found beyond a reasonable doubt that Pifer obtained or exerted control over these funds beyond the scope of her authority.
 {¶ 29} Furthermore, we find the evidence to be insufficient that Pifer's conduct was false or misleading as to counts one and three. Accordingly, Pifer's assignment of error is sustained as to counts one and three.
 {¶ 30} Next, we address the two hundred and fifty dollar check under count two. On appeal, Pifer argues that the evidence is insufficient to support her conviction. Specifically, Pifer argues, as she did at trial, that she used this check to purchase a reclining chair for Peak at Showplace under Pifer's account; thus, the funds were never misappropriated, and there can be no theft. According to Pifer's testimony she bought Peak a chair from Showplace in January of 2003. She went on to state that the chair was taken to the nursing home where Peak went to live in February of 2003. When Peak was unable to use the chair, Pifer testified that she hired someone to move the chair back to Peak's house. Finally, she stated that the chair was sold during an auction at Peak's house.
 {¶ 31} The State specifically questioned Peak about Pifer buying her a chair. During Peak's testimony she stated that "The only chair I had is the one I got at the nursing home now. I got it out at the Francis Scofield out there on West Market, or Logan Street. * * *." (Tr. p. 25.) When asked if a chair was ever delivered to the nursing home, Peak stated, "No. The only chair I got is the one I got now." (Tr. p. 26.) Thus, in light of Peak's conclusive testimony that Pifer never bought her a new chair and that she has always had the same chair, we find that the State provides some evidence going to each essential element of the crime and, if believed, that a rational trier of fact could find each element beyond a reasonable doubt. Accordingly, we find that the State presented sufficient evidence as to count two.
 {¶ 32} We next address Pifer's claim that the conviction was against the manifest weight of the evidence. When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins,78 Ohio St.3d at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172,175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.
 {¶ 33} Upon review of the record, we cannot say that in weighing all of the evidence we find that "the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. While we are critical of Peak's testimony and find that there is additional evidence in the record to support Pifer's testimony that she did buy a chair for Peak, we cannot say the evidence weights so heavily against conviction that the trial court's judgment must be reversed. Having found that the State presented sufficient evidence as to count two, the issue becomes one of credibility. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. State v. Jamison (1990), 49 Ohio St.3d 182, 191,cert. denied (1990), 498 U.S. 881, 111 S.Ct. 228. Accordingly, Pifer's assignment of error is overruled as to count two.
 {¶ 34} Having found error prejudicial to the Appellant herein, in the particulars assigned and argued, we reverse the judgment of the trial court as to counts one and three and remand the matter for further proceedings consistent with this opinion. Having found no error prejudicial to the Appellant as to count two, the judgment is affirmed in all other respects.
Judgment Reversed in Part, Affirmed in Part and CauseRemanded.
 Cupp and Bryant, J.J., concur.
[1] Because the garage sale issue is not relevant to this appeal, it will not be discussed in this opinion.